UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL NEWMAN,                          Case No. 12-10258

       Plaintiff,                    SENIOR U.S. DISTRICT JUDGE
v.                                      ARTHUR J. TARNOW

TOWNSHIP OF HAMBURG, et al.,            U.S. MAGISTRATE JUDGE
                                        R. STEVEN WHALEN

       Defendants.
_____/

## ORDER ADOPTING IN PART AND DECLINING TO ADOPT IN PART REPORT AND RECOMMENDATION [24] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]

On March 3, 2014, the Magistrate Judge issued a Report and Recommendation ("R&R") [24] recommending that Defendant's Motion for Summary Judgment [21] be granted. On March 14, 2014, Plaintiff filed an Objection [25] to the R&R [24] and on March 28, 2014 Defendants filed a Response [26]. For the reasons stated below, the Court adopts in part and declines to adopt in part the R&R [24]. Plaintiff's Objection [25] is **SUSTAINED** and Defendant's Motion for Summary Judgment [24] is **GRANTED** in part and **DENIED** in part.

## FACTUAL BACKGROUND

The Court adopts the explanation of facts set out in the R&R [15] as follows:

Plaintiff Daniel Albert Newman was convicted in the Livingston County Circuit Court of second-degree murder in connection with the death of Harry Chapplear on February 28,

1992. He was sentenced to 40 to 80 years imprisonment. Following a direct appeal and state collateral proceedings, a grant of habeas corpus in *Newman v. Metrish*, 492 F.Supp.2d 721 (E.D. Mich. 2007), and affirmance by the Sixth Circuit in *Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008), this Court granted a final, unconditional writ of habeas corpus on March 16, 2009 in *Newman v. Metrish*, E.D. Mich. No. 04-74582, 2009 WL 736820 (E.D. Mich., 3-16-09)(Tarnow, J). The writ was granted on the basis that there was legally insufficient evidence to support a conviction of guilt beyond a reasonable doubt. The facts brought out at the criminal trial were comprehensively set forth in this Court's initial June 15, 2007 Opinion and Order Granting the Petition for Writ of Habeas Corpus.[1]

Defendants Calhoun and DeBottis were the Hamburg Township Police Officers who investigated the Chappelear homicide. Plaintiff alleges that on February 9 and March 1, 1992, they interviewed one Jamie Stoll, and that Stoll denied knowing anything about the murder. However, says Plaintiff, Stoll subsequently failed a polygraph examination in which he was asked whether he murdered Chappelear, and whether he was present or planned the murder. *Complaint*, ¶ 13.[2]  Plaintiff also

---

[1] That Opinion and Order is appended to Defendants' motion as Exhibit B and to Plaintiff's response [Doc. # 22] as Exhibit 1.

[2]  The report of the Stoll's polygraph examination is attached to Plaintiff's response [Doc. #22] as Exhibit 6. Stoll answered "no" to each of the following questions: "(1) Do you know for sure who shot Harry? (2) Did you shoot Harry? (3) when Harry was shot were you there? (4) Did you plan with anyone to shoot Harry? (5) Concerning

alleges that during the interview, these Officers "reached over and grabbed a chunk of Stoll's hair out of his head, without his consent or a search warrant, and said they were going to analyze it for DNA." *Id*. ¶ 14.

Plaintiff alleges that on March 6, 1992, Calhoun and DeBottis interviewed Ben Masters, Sr., a neighbor of Chappelear, and that Masters told them that "on February 27 or 28, 1992," he spotted a black Blazer, driven by two or more white males in their twenties with light brown hair, leaving the area of Ogemaw Road and Cordley Lake Road. Master said that "that day or the next day," he heard gunshots coming from the area where he had observed the Blazer. *Id*. ¶ 16. The area where he saw the Blazer and heard the shots was about 75 feet from Chappalear's residence. *Id* ¶ 17.

Plaintiff alleges that on March 18, 1992, Defendant Calhoun presented an affidavit for a search warrant for Gary Kulpa's black SUV and hair samples from Gary Kulpa, as well as for a search warrant for Plaintiff's person and house. Plaintiff alleges that "on information and belief," the same affidavit was used to support the request for the warrant for his arrest. *Id*. ¶ 22. Plaintiff alleges that Calhoun's affidavit represented Masters' statement as being "that on or about 5:00 p.m. on February 27, 1992," he observed the black SUV on Cordley Lake Road.

---

Harry's death are you telling me any deliberate lies?" The examiner concluded, "It is the opinion of the undersigned examiner based upon the examination conducted, that the above listed subject is not truthful regarding the issue."

Plaintiff alleges that "[t]he affidavit plainly misrepresented Ben Masters, Sr.'s statement about the encounter with the dark SUV. In fact Mr. Masters Sr. Stated that "*unknown if (sic) was 2-27-92 or 2-28-92 what time he was getting ready to go to the party store*." *Id*. ¶ 23 (emphasis in original).

Plaintiff states that at the time of his arrest, the Defendants knew the following information:

A. That Plaintiff's shoe size did not match that of the shoe found in the blue gym bag that the police obtained;

B. The Plaintiff's physical description did not match that of the person reported to have been wearing the blue jacket. (The police had received information from an unknown female caller about that individual having been seen talking to Chappelear at a bowling alley around Thanksgiving of 1991);

C. There was no physical evidence linking Plaintiff to the murder;

D. There were no eyewitnesses to the murder;

E. Jamie Stoll failed a polygraph regarding his involvement in the murder;

F. No witnesses observed Plaintiff in possession of the Ruger 9mm handgun shortly before or after the murder;

G. No witnesses placed Plaintiff near the scene of the murder shortly before or after the murder. *Id*. ¶ 26.

Defendant Calhoun testified at his deposition that in this case, he worked very closely with the elected prosecutor, David Morse. He stated, "I have never worked more closely with a

prosecutor on any case than I did on this case. We went through every step of this step by step, fact by fact, document by document with David Morse personally." *Defendants' Exhibit J, Calhoun Deposition*, 35. The prosecutor's office drafted the affidavit in support of the search warrant. *Id*. 34. He said that he was present at least two times when Jamie Stoll was interviewed, and that he was aware that Stoll failed a polygraph examination. He said, "I thought [Stoll] could have knowledge of the homicide. He may have known who had done it, he may have a greater role that what we are aware of." *Id*. 50-52. Calhoun testified that after Stoll failed the polygraph, he (Calhoun) cleared up some inconsistencies in Stoll's statements, and "felt confident that he was not involved directly with the homicide, but whether or no he had more information than he was sharing with me, again to this day I don't–I am uncertain." *Id*. 53-56.

Calhoun testified that he was present when Stoll was interviewed at the State Police Post, but neither Trooper Cremonte nor anyone else pulled hair from Stoll's head. *Id*. 55-56. Calhoun stated that he "absolutely" informed Prosecutor Morse that Stoll had failed a polygraph and had given inconsistent statements. *Id*. 57.

As to the distinction between DeBottis' notes of his interview with Ben Masters, which indicates that Masters was not sure if he saw the SUV on February 27th or 28th, and the statement in Calhoun's search warrant affidavit that Master saw the SUV "on or about February 27th," Calhoun testified that

whatever DeBottis may have recalled about the Masters interview, "My contemporaneous memorialization of my recollection of that interview is contained in this affidavit. I believe this to be true and accurate. I believe he had a more definitive time from Mr. Masters, Sr." *Id.* 65-66, 68. He said that Prosecutor Morse told him that "the appropriate language to use was on or about February 27th of 1992...." *Id.* 66.

Defendant DeBottis testified at his deposition that when he interviewed Ben Masters, Sr., Masters said that he was unsure whether he had seen the SUV on February 27th or 28th . *DeBottis Deposition, Plaintiff's Exhibit 9 [Doc. #22]*, 27. He testified that Calhoun also spoke with Masters, but that he (DeBottis) wrote his report based on what he recalled Masters saying. He testified, "I don't know what Mr. Calhoun heard. I wrote this report based on what Mr. Masters said." *Id.* 28-29. DeBottis testified that he did not observe anyone touch or pull Jamie Stoll's hair during his interview at the State Police Post. *Id.* 30-31. DeBottis stated that Calhoun was the affiant on all of the search warrants in the case, as well as the arrest warrant for Plaintiff. *Id.* 32. He said that he was not aware of any additional information that was obtained between the request for the search warrant and the request for the arrest warrant. *Id.* 34-35. The fact that the weapon used to kill Chappelear was traced to Plaintiff was in both affidavits. *Id.*

Plaintiff testified at his deposition that he was released from prison on October 29, 2008. *Plaintiff's Deposition, Defendants' Exhibit I*, 8. He stated that in 2010, he was focused

on how he could get Jamie Stoll to "give him the information that the police suppressed" from him. *Id*.49. He brought Stoll to his attorney's office to give a statement. *Id*. 73. He conceded that Stoll had said under oath that neither Calhoun nor DeBottis took the hair from him, and did not know whether the prosecutor was aware that a hair sample had been secured from Stoll. *Id*. 50. Plaintiff asked Stoll if he killed Harry Chappelear, and Stoll said he had not. Nor did Stoll ever tell Plaintiff that he knew who the killer was. *Id*. 72-73.

James ("Jamie") Stoll was questioned under oath at Plaintiff's lawyer's office on September 15, 2011. The transcript is contained at Plaintiff's Exhibit 5. He stated that the police picked him up with regard to the Chappelear murder and took him to a State Police Post, where he was interrogated and given a polygraph exam. He was told that he failed the polygraph. *Stoll Transcript*, 3-6. He said that on a second day of being interviewed at the State Police Post, someone "snatched" his hair, but it was not Calhoun or DeBottis. *Id*. 9-10.

In Count I of the complaint, Plaintiff claims that Defendants violated the Fourth Amendment and Fourteenth Amendment due process by failing to disclose to either prosecutors or defense counsel exculpatory and impeachment evidence, including the hair sample taken from Jamie Stoll. Plaintiff also alleges in Count I that Calhoun and DeBottis "deliberately and knowingly supplied false information...in requesting an arrest warrant which was material to a finding of

probable cause." *Id*. ¶ 16. He claims that Defendant Township of Hamburg "created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendants, Calhoun and DeBottis, regarding the police department's constitutional obligation to turn over apparent exculpatory and impeachment evidence to the prosecutors...." *Id*. Finally, in Count I, Plaintiff makes a claim of malicious prosecution, "in violation of the Fourth Amendment," against Defendant Calhoun, alleging that Calhoun participated in the decision to prosecute the Plaintiff in the absence of probable cause.

In Count II, Plaintiff brings a claim of common law malicious prosecution against Defendant Calhoun. R&R [15] at 1–7.

## LEGAL STANDARD

The Court reviews objections to an R&R on a dispositive motion *de novo*. 28 U.S.C. § 636(b)(1)(C). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) The moving party has the burden of establishing that there are no genuine issues of material fact, which may be

accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must construe the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

Plaintiff's objections to the R&R are threefold and pertain only to his claims for malicious prosecution against Defendant Calhoun. Plaintiff does not object to the R&R's recommendation to grant summary judgment in favor of all Defendants on his *Brady* violation claim.

First, Plaintiff objects that the R&R engages in fact-finding—impermissible at the summary judgment stage—when it concluded that Defendant Calhoun was entitled to qualified immunity. Second, Plaintiff objects that the right to be free from arrest and prosecution without probable cause was clearly established before March, 1992. Third, Plaintiff objects that the Magistrate Judge, therefore, should have recommended denying Defendant's motion for summary judgment on his Fourth Amendment malicious prosecution claim. The Court will address Plaintiff's objections as they fit into the *de novo* analysis of Defendants' Motion [21] that follows.

**Malicious Prosecution Under Michigan Law**

To establish a claim of malicious prosecution under Michigan law, Plaintiff must show (1) that the prior criminal proceedings terminated in favor of plaintiff; (2) absence of probable cause for those proceedings; (3) malice, defined as a purpose other than that of securing the proper adjudication of the claim; (4) a special injury that flows directly from the prior proceedings. *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995). The parties only dispute elements (2) and (3).

For the reasons stated in the R&R [24], the Court concludes that there is a genuine question of material fact on element (2)—the issue of probable cause. *See* [24] at 15–16.

Two pieces of evidence inculpating Plaintiff in Chappelear's murder now bear on element (3)—the question of Defendant Calhoun's malice. The only evidence putting Plaintiff near the scene of the murder are the mischaracterized testimony from Ben Masters, Sr. and information allegedly from Kirk Johnson—Gary Kulpa's cousin—stating that Plaintiff had dogs who have fur with reddish accents. [21-13] at 6.

Defendant Calhoun and Defendant DeBottis interviewed Ben Masters, Sr. while investigating this murder. According to DeBottis' contemporaneous report of the interview, Masters told Defendants that he saw a vehicle matching the description of Kulpa's vehicle on either February 27, 1992 or February 28, 1992 at an unknown

time. [22-12].  Although DeBottis' contemporaneous report was available to him, Defendant Calhoun's affidavit for search warrant states,

> At approximately 5:00pm on or about February 27, 1992, [Masters] was driving east on Cordley Lake Road near its intersection when [Masters] observed [a vehicle matching the description of Gary Kulpa's vehicle with two white male occupants with brown hair in their twenties].

[21-13] at 5.   Although, Calhoun claims the affidavit represents his personal recollection, official police records do not match the affidavit for search warrant.  The discrepancy creates a question of material fact on the element of malice.  Drawing all facts in favor of Plaintiff, the Court concludes that a reasonable jury could find that Defendant Calhoun was attempting to fabricate probable cause in order to procure a warrant to search Plaintiff and his home to search for more evidence.  In other words, that Defendant Calhoun acted with "a purpose other than that of securing the proper adjudication of the claim," as the proper adjudication would require the existence of probable cause to support a search warrant.  *Payton*, 536 N.W.2d at 242; U.S. Const. amend. IV.  Defendant Calhoun may not escape liability at this stage by claiming that he shaded an affidavit to the court on the advice of third-party Prosecutor David Morse.

In a deposition taken for this case, Defendant Calhoun offered a *post-hoc* explanation for the discrepancy between official police records and the affidavit.  At his January 21, 2013 deposition, Defendant Calhoun testified that he was at the

intersection in question on February 28, 1992 around 4:30pm.  It is unclear why Calhoun would initially choose to mischaracterize Masters' statement in the affidavit, rather than faithfully relate the Masters interview and explain that Calhoun was at the intersection on February 28, 1992 if that's what actually happened.  Without any corroborating evidence for Calhoun's claim that he was at the intersection on February 28, 1992, the Court sees a genuine question of material fact as to malice even with Calhoun's *post-hoc* explanation for mischaracterizing Masters' statement in his affidavit for a warrant.

Another piece of evidence connecting Plaintiff to victim Chappelear is a statement allegedly given by Gary Kulpa's cousin, Kirk Johnson, to Defendant Calhoun.  The affidavit states that Defendant Calhoun "has spoken with" Kirk Johnson.  The record does not clarify whether Defendant Calhoun ever spoke with Kirk Johnson in person.  Michigan Department of Corrections Offender Tracking Information System ("OTIS") lists "Kirk Alan Johnson" and "Kurt Johnson" as aliases of Gary Kulpa.[3]  This means that the State of Michigan has officially recognized that Gary Kulpa has used the alias "Kirk Johnson" for criminal endeavors.  According to the affidavit, Kirk Johnson told police officers that both he and Plaintiff had purchased controlled substances from victim Chappelear.  It is hard to see why

------

[3] *See* Gary Joseph Kulpa's OTIS profile page: http://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=195666

Kirk Johnson would voluntarily and unnecessarily inculpate himself while speaking to a police officer.  For purposes of the underlying murder investigation, all Kirk Johnson would have had to say was that he knew victim Chappelear and so did Plaintiff.  Given that the evidence at that point most closely tied Gary Kulpa to the murder, it is possible that a reasonable jury would find that Gary Kulpa had identified himself as Kirk Johnson on the phone and gave Defendant Calhoun information directing the investigation away from Kulpa.

Even if a jury believed Defendant Calhoun had spoken with the actual Kirk Johnson, a reasonable jury could decide that a police officer with ten years of experience would not rely on information from a family member of a suspect when trying to "secur[e] the proper adjudication of the claim."  Again, the Court sees a question of fact on the element of malice.

In Michigan, government actors are entitled to governmental immunity for intentional torts if:

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
> (c) the acts were discretionary, as opposed to ministerial.

*Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008).  The good faith requirement means that "there is no immunity when the governmental employee acts

*maliciously* or with a *wanton or reckless disregard of the rights of another*." *Id.*, at 225 (emphasis in original) (footnote omitted). As demonstrated *supra*, there remains a question of fact on whether Defendant Calhoun was attempting to secure a search warrant without probable cause, an act that would show reckless disregard for Plaintiff's Fourth Amendment rights. *See supra*, p. 5. Therefore, Defendant Calhoun is not entitled to governmental immunity because there is a genuine question of material fact regarding his good faith.

### § 1983 Malicious Prosecution Under Federal Law

To establish a claim for malicious prosecution under the Fourth Amendment Plaintiff must show (1) The defendant "ma[d]e, influence[d], or participate[d] in the decision to" initiate criminal prosecution against the plaintiff; (2) there was no probable cause; (3) Plaintiff suffered a "'deprivation of liberty' . . . apart from the initial seizure" as a consequence of the prosecution; and (4) the criminal prosecution was resolved in plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). It is undisputed that Plaintiff has established elements (1), (3), or (4) and, as stated in the R&R [24], Plaintiff has established a question of material fact as to element (2) of the Fourth Amendment malicious prosecution claim. [24] at 17. The R&R, however, goes on to recommend granting summary judgment in favor of Defendant on the basis of qualified immunity. Upon *de novo* review, the Court disagrees for the reasons that follow.

**Qualified Immunity**

Defendants argue that they are entitled to summary judgment on Plaintiff's malicious prosecution claim because they are protected by qualified immunity. Qualified immunity analysis involves two questions: (1) did the defendant violate a constitutional right and (2) was the right clearly established to the extent that a reasonable person in the defendant's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 121 (2001). Third, the Court determines "whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir. 1996).

First, as stated previously in this Order at 11 and the R&R [24] at 15–16, there is at least a question of fact about whether Plaintiff was prosecuted absent probable cause—a Fourth Amendment violation.

Second, the Fourth Amendment itself, dating to 1789, states "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Therefore, in 1992, a reasonable police officer in Defendant Calhoun's position would know that he needed probable cause to support an affidavit for a search warrant. Plaintiff's second objection is well-taken.

Third, Plaintiff must show that Defendant Calhoun's actions were objectively unreasonable in light of the clearly established constitutional rights. "The question is whether the undisputed facts 'demonstrate that a hypothetical reasonable officer' would have known that his actions, under the circumstances, were objectively unreasonable," *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005) (internal citation omitted). The subjective motivations of the official are irrelevant to the third prong of the qualified immunity inquiry. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Here, there are two lines of relevant undisputed facts. The first line is that Defendant DeBottis' Report [22-12] was the official police record of Ben Masters, Sr.'s statement to the police, that DeBottis' Report was available to Defendant Calhoun at all relevant times, that Calhoun's affidavit for search warrant differed from the official police record regarding Masters' statement. The second line of relevant facts is that there was physical evidence connecting Kulpa with the murder, yet Calhoun relied on statements allegedly made by Kulpa's family member instead of relying on the physical evidence to direct the investigation toward Plaintiff. In an affidavit for search warrant in a murder case, it is objectively unreasonable for a ten-year veteran to swear to facts disputed by police records that were readily available to him, without further explanation. Even if Calhoun subjectively believed Masters saw Kulpa's car on February 27, 1992, Calhoun still mischaracterized Masters'

statement in the affidavit. To a lesser extent, it is also objectively unreasonable to rely completely on the statement of a family member of the person most inculpated by the physical evidence to steer the investigation.

The R&R reasoned that because several courts have disagreed about whether probable cause existed in this case, Defendant Calhoun's actions were not "objectively unreasonable." The R&R's logic is unpersuasive. In his direct appeal, the Michigan Court of Appeals misstated the evidence against Plaintiff in several instances as stronger than it actually was. *See People v. Newman*, No. 165208 (Mich.Ct.App. July 2, 1999) 1999 WL 33439648 (e.g., mistakenly stating Plaintiff was jealous and possessive, when Plaintiff's girlfriend testified to the opposite; mistakenly stating that hair recovered from the ski mask matched petitioner's hair when forensic analysis could not confirm that; mistakenly stating that Plaintiff had "repeatedly" asked a friend for the names of any drug dealers he could *rob* for drugs or money when Plaintiff had only expressed interest in *burglarizing* dealers' homes once). Therefore, that court's legal conclusions as derived from misstated facts do not bear on the case at bar. Similarly, the Court presumes that the Michigan Supreme Court's decision to deny Plaintiff's discretionary appeal was at least partially based on the Michigan Court of Appeals' faulty summation of the case, otherwise it would have been clear that Plaintiff's direct appeal had merit (given, that Plaintiff was later able to overcome the higher hurdles involved in his federal habeas claims).

Plaintiff objects that the Magistrate Judge engaged in impermissible fact-finding when it stated that the Masters statements "likely did not play a significant role in the judge's probable cause determination." [24] at 20. The Court agrees. Fact-finding is improper at the summary judgment stage. Additionally, the R&R utilized a harmless-error analysis to find that Calhoun's actions were not objectively unreasonable when it reasoned that the inclusion of the mischaracterized Masters testimony likely did not influence the judge's decision. Harmless-error analysis is improper in the third prong of the qualified immunity inquiry. Again, "[t]he question is whether the undisputed facts 'demonstrate that a hypothetical reasonable officer' would have known that his actions, under the circumstances, were objectively unreasonable," *Lyons*, 417 F.3d at 576. The inquiry is about knowledge and intent, not effect. Even if probable cause existed absent Masters' mischaracterized statement, that would be no excuse if a jury found that Calhoun deliberately mischaracterized Masters' statement in the affidavit.

## CONCLUSION

For the foregoing reasons, the Court hereby adopts in part and declines to adopt in part the Report and Recommendation [24]. Accordingly,

**IT IS ORDERED** that Plaintiff's Objection [25] is **SUSTAINED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary

Judgment [21] is **GRANTED** as to Plaintiff's *Brady* violation claim and **DENIED** as to Plaintiff's claims for malicious prosecution.

      **IT IS FURTHER ORDERED** that Defendant Township of Hamburg and Defendant Patrick Debottis are **DISMISSED**.

      **SO ORDERED**.

|  |  |
|---|---|
|  | s/Arthur J. Tarnow |
|  | Arthur J. Tarnow |
| Dated: April 4, 2014 | Senior United States District Judge |